# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUIS ALEJANDRO FLORES, | Case No.  1:13-cv-00738-SAB-HC |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT AND TERMINATE CASE |
| RICK HILL, Warden, | |
| Respondent. | ORDER DECLINING ISSUANCE OF CERTIFICATE OF APPEALABILITY |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254.  The parties have voluntarily consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a judgment of the Superior Court of California, County of Merced, following his conviction by jury trial on April 23, 2010, of second degree murder (Cal. Penal Code § 187), and having personally used a deadly or dangerous weapon during commission of the offense (Cal. Penal Code § 12022(b)).  On September 1, 2010, Petitioner was sentenced to serve a prison term of 16 years-to-life.

1

1    Petitioner timely filed a notice of appeal.  On February 29, 2012, the California Court of

2  Appeal, Fifth Appellate District ("Fifth DCA"), affirmed the judgment.  On March 12, 2012,

3  Petitioner filed a petition for rehearing in the Fifth DCA.  The petition was denied on March 27,

4  2012.  On April 9, 2012, Petitioner filed a petition for review in the California Supreme Court.

5  The petition was summarily denied on May 16, 2012.

6    On May 17, 2013, Petitioner filed the instant federal habeas petition in this Court.  As his

7  sole claim for relief, Petitioner alleges his Sixth Amendment right to present a defense was

8  violated when the trial court failed to instruct the jury *sua sponte* on unconsciousness.  On

9  September 20, 2013, Respondent filed an answer to the petition.  On December 30, 2013,

10  Petitioner filed a traverse.

11  <center>**II.**</center>

12  <center>**STATEMENT OF FACTS[1]**</center>

13  ***INTRODUCTION***

14  Sometime between November 4 and 6, 2005, appellant/defendant Luis Alejandro
    Flores (defendant) cut the throat of his live-in girlfriend, Jackie Lua (Jackie),
15  placed her on a bed in their apartment, and then slit his own throat and lay next to
    her. He left behind notes indicating that he did it "for love." Jackie bled to death.
16  Defendant survived and dialed 911 for help. As paramedics treated the knife
    wound to his throat, defendant indicated he had cut Jackie's throat and then his
17  own.

18  Defendant was charged with the first degree murder of Jackie (Pen.Code § 187),
    with the special allegation that he personally used a dangerous or deadly weapon,
19  a knife (§ 12022, subd. (b)). After a lengthy jury trial, defendant was found not
    guilty of first degree murder, but guilty of the lesser included offense of second
20  degree murder, and the special allegation was found true. Defendant was
    sentenced to 15 years to life plus one year for the special allegation.

21

22  On appeal, defendant contends the court had a sua sponte duty to instruct the jury
    on unconsciousness as a complete defense to murder. Defendant also argues that
23  his constitutional rights were violated when the court conducted a restitution
    hearing in his absence. We will affirm.

24  ***FACTS***

25  In 2004, defendant met Jackie and they started dating. Defendant was 28 years old

26  ─────────────────────
    [1] The Fifth DCA's summary of the facts in its February 29, 2012, opinion is presumed correct. 28 U.S.C. §§
27  2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts
    the factual recitations set forth by the Fifth DCA. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir.2009),
    *cert. denied*, 130 S.Ct. 1086 (2010) ("We rely on the state appellate court's decision for our summary of the facts of
28  the crime.").

<center>2</center>

and worked as a substitute teacher in Winton. Jackie was 20 years old. During the next year, they broke up three or four times, but they reconciled on each occasion and lived together. Around October 2005, they moved into a one-bedroom apartment on K Street in Merced.

Prescilla Guerrero, Jackie's close friend, testified that she was with Jackie on occasions when defendant would call her. Jackie said defendant called "just to check up on her, I guess, see what she's doing." Guerrero testified that about one week before the homicide, Jackie said that "she didn't want to be with [defendant] anymore, that she just wanted to break up on good terms with him." About two days before the homicide, Guerrero and Jackie had lunch, and Jackie received a cell phone call from defendant. Guerrero could hear defendant yelling over the phone. Based on Jackie's responses, Guerrero believed defendant was "upset that she had left and was yelling at her."

Roberto Lua, Jr. (Robert), Jackie's brother, testified that defendant and Jackie regularly took care of his 18–month old child when he had weekend custody, and the child was always well-cared for. Robert did not know about any violence between defendant and Jackie. Robert testified about a conversation he had with Jackie just a few days before the homicide. Jackie said that she was going to end her relationship with defendant because "they weren't getting along, and she didn't want to go with him no [sic] more."

Ryan Natasha Zurney, the mother of Robert's child, testified that when Jackie started to date defendant, "[s]he wasn't really allowed to talk to anybody, any of her friends too often." Jackie told Zurney that defendant did not like her talking to certain people. About two months before the homicide, Jackie told Zurney about an incident when defendant and Jackie argued in a car. Jackie said that defendant "was driving extremely fast down Bear Creek ... and he was threatening if he left her that he would drive the car into the creek and kill them both."

Zurney testified that Jackie never said she was afraid of defendant. On one or two occasions, however, Jackie said that defendant threatened to kill himself if she ever left him. Zurney believed Jackie was afraid of defendant once or twice, "because there were a couple of times where she would catch him driving by her house many times while they were split up." A police detective testified he interview[ed] Zurney after the homicide, and Zurney never said that Jackie was afraid of defendant.

Roberto Lua, Sr. (Mr. Lua), the father of Jackie and Roberto Jr., testified that about five months before the homicide, defendant took Jackie to Mexico, though she did not want to go. Mr. Lua believed defendant kidnapped her. Jackie was afraid because they were so far from home, and she feared defendant would do something to her. After they returned, Jackie told her father that they stayed at a hotel and had an argument by the balcony. Jackie said defendant "picked her up and held her over the balcony and threatened ... to drop[ ] her if she would leave him." A few weeks later, Mr. Lua confronted defendant about this incident. Defendant said "they were just playing around." Jackie was present during this conversation and just smiled. Mr. Lua felt Jackie did not want to disagree with defendant.

Mr. Lua testified that a couple of months before the homicide, Jackie told him about the incident when she argued with defendant in the car. Jackie said defendant accelerated the car and, as they reached the creek, defendant said, "'If you leave me, I'll kill myself. I'll go straight to the canal.'" Jackie said that

defendant threatened to kill himself every time they argued. About a week before the homicide, Jackie told her father that they argued, and defendant again threatened to kill himself. Mr. Lua warned Jackie about defendant, but Jackie said "'there's no way he would do such a thing.... He loves me, and I love him.'"

On Thursday, November 3, 2005, defendant called his mother and wished her a happy birthday. They planned to visit with each other on Saturday, November 5, 2005, but she never heard from him that day.

On Saturday, November 5, 2005, defendant and Jackie picked up Robert's 18–month old baby to watch the child for the weekend, as they had planned. Robert called them a few times to check on the baby, and there were no known problems.

### The 911 call

Around 2:00 a.m. on Sunday, November 6, 2005, the Merced Police Department received a 911 call from the apartment where defendant and Jackie lived. The operator could only hear someone breathing in the background, but no one spoke or responded to the operator's questions.

At 2:02 a.m., Merced Police Detective Luis Solis arrived at the apartment. Solis entered through the unlocked front door. Solis found defendant and Jackie lying next to each other on a fold-out bed in the living room. The bed was extremely bloody, and defendant and Jackie were covered in both dry and fresh blood.

Jackie's throat had been severely cut with a knife. There were jagged edges on her neck, consistent with more than one cutting motion. She was not breathing and did not have a pulse. It appeared she had bled to death.

Defendant also had a throat wound, and it appeared his throat had been cut once. He was barely breathing. His eyes were closed, but Solis saw involuntary eyelid tremors. There were burn marks on defendant's right cheek, consistent with being inflicted from the apartment's electric stove coils. There were also wounds on his wrist. There was a cordless telephone under defendant's lower body.

One officer later described the apartment as one of the "bloodiest crime scenes" he had ever seen. There was blood all over the kitchen counters, walls, and on the floor. There were bloody footprints on the kitchen floor, indicating that someone had walked through the blood. There was blood in the bathroom sink and floor, and on the hallway and living room walls.

There were two Cutco-brand knives at the top of the fold-out bed. The knives were just above the pillows, a couple of feet away from the heads of defendant and Jackie. One knife was large, and the other was a small paring knife. The small knife was on top of the large knife.

Robert's baby was found sleeping in the back bedroom. The child was not injured.

### The notes

There were three notes in the apartment, all of which were covered with blood. One note was on the floor and stated: "'Jackie Lua with me till death. I said it always.'"  The other note was on a table near the fold-out bed and stated: "'I did it for love. Forgive me, God. Mom, I love you with all my heart, Luis,'" and "'Brother, I love you too.'" Both notes appeared to have been written by the same

4

person, in the same ink color.

A third note was found on the living room floor, at the foot of the fold-out bed. It contained Jackie's cell phone number, in the same ink color as the other two notes. Defendant's fingerprint was found on that note.

### Chief Bryan Donnelly's questions to defendant

The paramedics and other officers arrived at the apartment within minutes of Detective Solis's arrival. Battalion Chief Bryan Donnelly, the head of the fire department's emergency response team, found defendant and Jackie on the bed. Donnelly examined Jackie and pronounced her dead.

Donnelly testified that defendant had a laceration on the front of his neck. Defendant was "mildly" bleeding, and he was not moving. Defendant made a gurgling noise, and Donnelly realized he was still alive. Donnelly rolled defendant over, removed coagulated blood from the neck laceration, put a breathing tube into his throat, and administered oxygen. Defendant's eyes opened, he moved around, and he became responsive. Donnelly did not administer any sedatives or painkillers.

Donnelly testified he was concerned about defendant's condition and thought he might die at any time. Donnelly decided to ask defendant some questions because he wanted to get information "on who had done this." Defendant was not able to verbally respond, but he could nod and shake his head. Donnelly testified that defendant was cooperative and tried to respond as best as he could.

Donnelly asked defendant "if he knew who had done this to him," and defendant nodded yes and blinked his eyes. Donnelly asked defendant if gang members had done this, and defendant shook his head no. Donnelly then asked defendant if he had done this. Defendant nodded affirmatively and blinked his eyes.

### Detective Solis's questions to defendant

Solis testified that he saw defendant nodding his head in response to Donnelly's questions. Donnelly informed Solis about defendant's responses.

Solis testified he also decided to ask defendant questions because defendant was seriously injured and might not survive. The paramedics continued to treat defendant as Solis talked to him. Solis tried to get defendant to write down responses to his questions, but defendant was not able to hold a pen. Instead, Solis asked defendant to blink rapidly for "yes," and close his eyes for "no," in response to his questions.

Solis asked another officer to turn on a tape recorder. Solis asked questions, and Donnelly gave verbal responses on the tape recording to report defendant's eye and head movements. Solis asked defendant if he could hear him. Defendant rapidly blinked his eyes to indicate yes.

Solis asked defendant if he knew who had done this to him. Defendant rapidly blinked his eyes to indicate yes. Solis asked defendant if his name was "Luis." Defendant rapidly blinked his eyes. Solis asked defendant if he "did this to himself." Defendant rapidly blinked his eyes and also "nodded his head up and down." Solis asked defendant if he called the police, and defendant again rapidly blinked his eyes.

Solis next asked defendant if his wife was next to him. Defendant shut his eyes, and shook his head from side to side, indicating no. Solis asked if the woman was his girlfriend. Defendant rapidly blinked his eyes and nodded his head up and down, to indicate yes. Solis asked defendant if he cut his girlfriend's throat. Defendant rapidly blinked his eyes. Solis also asked defendant if he cut his own throat. Defendant again rapidly blinked his eyes.  During pretrial motions, the court held defendant's blinks and nods, given in response to questions from Chief Donnelly and Detective Solis, were admissible because they were conducting an initial investigation of the crime scene, defendant was not subject to custodial interrogation, the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) were not required, and defendant was responsive and appeared to understand the questions.

Defendant was transported to the hospital and survived the knife wound. He was charged with the first degree murder of Jackie.  Less than a week after the homicide, Detective Harry Markarian visited defendant in the hospital and interviewed him on two occasions. Markarian advised defendant of the *Miranda* warnings. Defendant still could not speak but he made gestures in response to some questions, but he was silent when asked other questions, and it was not clear whether he was coherent or alert. After a pretrial evidentiary hearing, the court granted defendant's motion to exclude these two interviews, and found defendant's responses were involuntary because defendant was "nonresponsive" and "barely coherent."

### The autopsy

The pathologist testified that Jackie's cause of death was exsanguination, or bleeding out, from a "complex cutting wound" to the front of her neck. Jackie had suffered "more than one cut" from a knife to "multiple structures of the neck," and "it all appeared to be cutting without stabbing." There could have been 8 to 15 cuts to her neck. There was "some scalloping to the edges of the wound and some other cuts in the base of the wound" that were consistent with "more than one cut." The wounds were consistent with being inflicted by the large knife found on the fold-out bed. It would have taken two or three minutes for someone to inflict all the knife wounds on Jackie. One cut hit the carotid artery, and she would have died within one to two minutes.

Jackie also suffered several contusions on her face, chest, and the front and back of her lower body. She had a large bruise on the left rear side of her head. The contusions were consistent with blunt force injuries. She did not have any defensive wounds, and there were no signs that she had struggled. Jackie's blood-alcohol level was 0.18 percent, which would have rendered a person intoxicated.

The pathologist reviewed photographs which showed defendant and Jackie laying next to each other on the fold-out bed, with defendant's arm around Jackie. The pictures were taken by the officers when they initially responded to the apartment. The pathologist testified defendant could not have inflicted the knife wounds on Jackie's neck if they had been in those positions because her neck was not exposed enough. The pathologist believed Jackie's body was moved and the positions were "posed" after she was stabbed.

### Defendant's wounds

The pathologist examined the photographs of defendant's neck wound and testified it was inflicted by a single slice of a knife, consistent with being inflicted

6

with the large knife found on the bed. The wound was six inches long from the right to left side of the throat. It would have allowed defendant to breathe but prevented him from being able to speak. Defendant also had knife lacerations on his wrist, which were consistent with being inflicted with the small paring knife found on the bed.

### DEFENSE EVIDENCE

Defendant presented several witnesses who had known him for many years. These witnesses testified that they had seen defendant and Jackie together; that Jackie never seemed afraid of defendant; that defendant never acted controlling or domineering toward her; and that defendant never said he would kill himself if Jackie left him. These witnesses admitted they were shocked by the homicide, and they did not know the details until they appeared at trial. One friend testified that he knew defendant and Jackie broke up several times, defendant would get very sad during those occasions, his friend encouraged him to date other girls, but defendant was deeply in love with her and they always reconciled.

#### Defendant's trial testimony

Defendant testified that he dated Jackie for about one year before the homicide. In late March 2005, Jackie told defendant that she was pregnant. A few days later, Jackie went to the doctor and told defendant that she had miscarried.

Defendant testified that in May or June 2005, he proposed to Jackie and she accepted. They moved in with defendant's parents but only stayed there for one night. On that particular night, defendant and Jackie each drank a 40–ounce bottle of beer. Defendant testified that Jackie regularly drank that much beer. Defendant and Jackie argued because defendant wanted to go to sleep, but Jackie wanted to stay up late. Defendant walked out, drove to see Jackie's mother, and told her to come and get Jackie because "it was getting out of hand at my house." Defendant drove Jackie's mother back to his parents' house, and defendant went to bed. However, Jackie kept arguing with him, and she threw things at him in bed. Jackie eventually left with her mother.

Defendant testified that a few days after this incident, he went to Jackie's house and spoke to her parents. Defendant told her mother that he did not take care of Jackie because Jackie had a drinking problem, and she went out at night to drink. Jackie later called him and they reconciled. They lived in several different apartments that summer. They continued to argue, but they always reconciled.

Defendant testified he did not take Jackie to Mexico against her will, and he never threatened to throw her over the hotel balcony. Defendant testified they were "always drinking" during that trip, and Jackie asked what he would do if she left him. Defendant replied that he would push her off the balcony and "'jump with you in my arms.'" Defendant testified he gave that response because he thought Jackie wanted to hear that. Jackie asked if he would really do that, and defendant laughed and said no.

Defendant also testified he never threatened to drive Jackie into a canal. Defendant testified that they were driving when Jackie asked what he would do if she left him. Defendant replied that he would drive into the creek. Defendant testified that Jackie grabbed the wheel. Defendant told her that he was just playing and would never do that, and to let go of the steering wheel because he was going to lose control.

Defendant admitted that he may have told Jackie that he would kill himself if she left him. Defendant claimed he never meant it, and he only said what she wanted to hear.

Defendant testified they were supposed to go to his mother's house on November 3, 2005, to celebrate his mother's birthday. They did not go, and defendant falsely told his mother that Jackie had to attend a meeting at work. The real reason, however, was that Jackie had to attend a DUI class.

Defendant testified that the day before the homicide, they took care of Robert's child, as they usually did on the weekends. Defendant planned to visit his mother on the weekend to belatedly celebrate her birthday.

### *Defendant's testimony about the homicide*

Defendant testified about the events of the evening which led to the homicide. On Friday night, November 4, 2005, defendant and Jackie were at the apartment, and they each drank a 40–ounce beer. Defendant testified that Jackie wanted to drink more. Defendant warned her not to continue drinking because they were taking care of the baby.  Jackie insisted that she wanted to continue drinking, and they argued. Defendant eventually agreed that they would buy more beer. They put the baby in the car, defendant drove to the store, and Jackie waited with the baby while defendant bought two more 40–ounce beers. Defendant admitted he bought alcohol for Jackie even though she was under age and he thought she had a drinking problem, but he only did it to end their arguments.

Defendant testified they returned to the apartment. Defendant did not finish his beer because he was sick with a fever and the flu, and he just wanted to relax. Jackie drank her beer, and she was angry because defendant did not want to party. Defendant told her that he wanted to go to sleep because he did not feel well. Jackie was upset and wanted to buy more beer. Defendant refused and told her to go to sleep because she was drunk. Jackie cursed him and they continued to argue.

Defendant told Jackie that he would sleep on the fold-out bed in the living room. He told her to sleep with the baby in the apartment's only bedroom so she could calm down. Jackie was still upset, but she agreed.

Defendant testified he opened the fold-out bed and Jackie went into the bedroom. About 20 minutes later, Jackie returned to the living room and started arguing with him again. Jackie got into the fold-out bed with defendant and kept yelling at him. Defendant got up, walked away from her, and went into the adjacent kitchen. Defendant could not remember if Jackie hit him that night.

Defendant testified that Jackie accused defendant of not being able to have sex with her because of a physical problem. Jackie said that was why she had sex with another man. Jackie repeatedly said that she preferred to have sex with the other man. Defendant testified he "started tripping out." He was not happy because he had "given up everything for her," and he did not understand "why she was upset."

> "She kept saying a whole bunch of things and I couldn't hear anymore. Like, I couldn't just hear her anymore. Everything just came together in my head. I don't know what happened. Then I ended up with a knife in my hand."

Defendant testified he stood in front of Jackie in the living room "and then I remember getting my hand and cutting her." He used a knife from the kitchen. Defendant did not remember grabbing the knife. He did not remember what he was thinking when he raised his arm and cut her throat. He realized that he was cutting her neck for a couple of seconds, but he could not stop. "[E]verything blew up in my head."

> "And it didn't seem real – what was happening. Her body was, like, numb and stuff. My hand was all hot. I don't know. And then when I seen that I was cutting her, I realized when I saw her face that it was just like a blank stare. I laid her down. I don't know, but it like look like she was gone. And then – and then I cut myself too."

Defendant testified he never wanted Jackie to die, he did not want to kill her, and he did not know why he cut her neck. He said he never hit her in the head, and there "was never a fight to defend herself from."

Defendant agreed with his defense attorney's description that he was in "a very hot-blooded rage" when he cut Jackie's throat. Defendant testified he "was emotional" and he "didn't understand what was going on. My blood was pumping fast and I felt hot." The prosecutor pursued this point during cross-examination:

> "[THE PROSECUTOR]. So you were in a hot-blooded rage. I guess that's another way of saying you were really angry?
>
> "[DEFENDANT]. I don't know.
>
> "Q. Well, you remember a lot of things that [Jackie] told you, so now you don't remember how you felt when she was saying that stuff to you?
>
> "A. I remember she was telling me a lot of things and I couldn't hear her anymore. It started fading away. So many things were coming together in my head, and then I don't know what happened. It felt like – like I blacked out...."

Defendant testified that he cut his throat because Jackie was "gone, so I didn't want [to] stay behind." Defendant intended to kill himself and realized he could not talk. Defendant hugged Jackie and tried to tell her that he loved her, but he could not talk because of his own knife wound. Defendant kissed Jackie and lay next to her on the fold-out bed. He was bleeding and thought he was going to die.

Defendant testified it was dark outside and he passed out. He kept waking up and realized it was daylight. He got up from the bed and went to the kitchen and bathroom. He looked in the mirror to see if he was cut. He fainted and fell down several times. Defendant went into the bedroom and gave the baby some milk. He may have burned his face on the electric stove, but he did not remember how that happened. Defendant went back to the fold-out bed and passed out.

Defendant testified that sometime during the day (Saturday), he wrote the notes which were found in the apartment. He did not know the time but it was daylight outside. Jackie was lying dead on the bed.

Defendant testified that when he realized he was still alive, he used a small paring knife from the kitchen to slit his wrist because he wanted to die. It was starting to get dark outside. Defendant did not call 911 because he did not want anyone to

come until he was dead.

Defendant testified that he was on the bed for a long time and realized that he was still alive. He was worried about the baby, and he finally called 911 so someone would pick up the child.

## INSTRUCTIONS AND CLOSING ARGUMENTS

The instructional conference was primarily held off the record. However, the court noted that it would instruct the jury on the charged offense of first degree murder and the lesser included offenses of second degree murder and voluntary manslaughter. The voluntary manslaughter instructions were based on heat of passion, provocation, and sudden quarrel. As we will discuss in section I, post, defense counsel did not request instructions on unconsciousness as a complete defense.

In closing argument, the prosecutor argued defendant was guilty of first degree murder and his trial testimony was not credible and refuted by the two notes he admittedly wrote after he killed Jackie. The prosecutor argued the notes corroborated the prosecution witnesses who testified that Jackie was afraid of defendant and that defendant had threatened to kill her if she left him. Defendant made multiple decisions and took several steps to kill her, which showed premeditation and deliberation: he went into the kitchen, he looked for a knife, he grabbed the knife, he went back into the living room, he raised his arm, and he cut her neck 8 to 15 times. He did not randomly stab her, but he methodically cut into her neck, and he knew what he was doing.

In his closing argument, defense counsel noted that defendant never denied that he killed Jackie, and the question was whether he was guilty of second degree murder or voluntary manslaughter. Defense counsel argued defendant's actions did not reflect a cold, calculated, premeditated, rational plan to kill Jackie, and the events of that night "bewildered [defendant], it bewilders him today. He still thinks about it." Counsel argued the killing was "a crime of passion" that occurred "in a moment of passion, in a moment of heat."

Defense counsel argued that a rash decision to kill did not constitute first degree murder. Counsel asserted that Jackie was drunk, she "nagged" defendant and challenged his manhood, but defendant was tired and sick with the flu. Defendant just wanted to sleep but Jackie kept nagging him.

"[Jackie's] barrage went on and on and on. And you heard the testimony that at some point – he didn't know, but at some point, it just went beyond him. At some point, whatever she was saying went and his head and his body did things he never understood; but before he had realized it, he had committed a horrible, horrible act, there was no premeditation.

"While he was killing, at the moment he killed, the barrage, the words, humiliation was still going on, still continuing. And he even lost track of exactly what words were at a certain point. It is not selective memory, ladies and gentlemen.

"When you're in a mental state where you can still grasp what's going on and you still have some control over your emotions, over your passions, you can remember. At some point when things go red, burning white, whatever happens in those situations, your mind blocks out more than it

1    can take. And sometimes, sometimes, unfortunately, some of us will do
     something that you will regret for the rest of your life.

2
     "And I'm telling you that this is what happened on this date in his life."

3
     Defense counsel extensively discussed voluntary manslaughter, heat of passion,

4    provocation, and sudden quarrel. Counsel acknowledged that defendant couldn't
     explain what was going on in his head and still couldn't understand why he did it,

5    but the killing resulted from an emotional outburst and constituted voluntary
     manslaughter. Jackie was drunk, defendant was in a weak condition because he

6    was sick, and "[s]omething in him snapped."

7            "And as he told you, his experience was like his body went numb and he
             almost came outside of himself, and what he did, the moment he killed

8            Jackie, he turned the knife to himself and he doesn't even remember
             exactly how, but he just remembered that – realized what he had done

9            when he looked at Jackie's lifeless eyes, and he no longer wanted to live."

10   Defendant was convicted of second degree murder.

11   (Resp't's Answer, Ex. A.)

12                                          **III.**

13                                     **DISCUSSION**

14   **A.      Jurisdiction**

15          Relief by way of a petition for writ of habeas corpus extends to a person in custody

16   pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

17   or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v.</u>

18   <u>Taylor</u>, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as

19   guaranteed by the U.S. Constitution.  The challenged conviction arises out of Merced County

20   Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28

21   U.S.C. § 2241(d).

22          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

23   of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

24   enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th

25   Cir. 1997) (en banc).  The instant petition was filed after the enactment of the AEDPA and is

26   therefore governed by its provisions.

27   **B.      Standard of Review**

28          Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

                                              11

barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624 (2011); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of

1    materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412-13; <u>see also</u> <u>Lockyer</u>, 538 U.S. at
2    72.  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite
3    in character or nature,' or 'mutually opposed.'"   <u>Williams</u>, 529 U.S. at 405 (quoting Webster's
4    Third New International Dictionary 495 (1976)).   "A state-court decision will certainly be
5    contrary to [Supreme Court] clearly established precedent if the state court applies a rule that
6    contradicts the governing law set forth in [Supreme Court] cases."  <u>Id</u>.  If the state court decision
7    is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed
8    under the pre-AEDPA de novo standard.  <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir.2008) (en
9    banc).

10        "Under the 'reasonable application clause,' a federal habeas court may grant the writ if
11   the state court identifies the correct governing legal principle from [the] Court's decisions but
12   unreasonably applies that principle to the facts of the prisoner's case."  <u>Williams</u>, 529 U.S. at
13   413.  "[A] federal court may not issue the writ simply because the court concludes in its
14   independent judgment that the relevant state court decision applied clearly established federal
15   law erroneously or incorrectly.  Rather, that application must also be unreasonable."  <u>Id</u>. at 411;
16   <u>see also</u> <u>Lockyer</u>, 538 U.S. at 75-76.  The writ may issue only "where there is no possibility
17   fairminded jurists could disagree that the state court's decision conflicts with [the Supreme
18   Court's] precedents."  <u>Harrington</u>, 131 S.Ct. at 784.  In other words, so long as fairminded jurists
19   could disagree on the correctness of the state courts decision, the decision cannot be considered
20   unreasonable.   <u>Id</u>.    If the Court determines that the state court decision is objectively
21   unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the
22   error had a substantial and injurious effect on the verdict.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619,
23   637 (1993).

24        Petitioner has the burden of establishing that the decision of the state court is contrary to
25   or involved an unreasonable application of United States Supreme Court precedent.  <u>Baylor v.</u>
26   <u>Estelle</u>, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the
27   states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a
28   state court decision is objectively unreasonable.  <u>See</u> <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669

(9th Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v. Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)). However, a state court factual finding is not entitled to deference if the relevant state court record is unavailable for the federal court to review. Townsend v. Sain, 372 U.S. 293, 319 (1963), *overruled by*, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

## C.    Review of Claim

In his sole claim for relief, Petitioner alleges his Sixth Amendment right to present a defense was violated when the trial court failed to *sua sponte* instruct the jury on unconsciousness as a complete defense to the charge of murder.

This claim was presented on direct appeal to the Fifth DCA and it was denied in a reasoned decision. Petitioner then raised the claim to the California Supreme Court in a petition for review. The petition was denied without comment. When the California Supreme Court's opinion is summary in nature, the Court must "look through" that decision to a court below that has issued a reasoned opinion. Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991). Here, the appellate court analyzed and rejected the claims as follows:

> ***I. The court did not have a sua sponte duty to instruct on unconsciousness as a complete defense***
>
> Defendant argues the court had a sua sponte duty to instruct on unconsciousness as a complete defense to the charge of murder, pursuant to CALCRIM No. 3425. Defendant asserts his trial testimony raised substantial evidence to support the court's sua sponte duty to give this instruction, because he testified that he could not remember why or what happened when he stabbed Jackie.
>
> ### A. A court's sua sponte duty to instruct
>
> "A court must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial. [Citations.]" (*People v. Ervin* (2000) 22 Cal.4th 48, 90.) This obligation requires instructions on lesser included offenses if there is substantial evidence that, if accepted by the trier of fact, would

14

absolute the defendant of guilt of the greater offense but not of the lesser. (*People v. Blair* (2005) 36 Cal.4th 686, 745.) "[A] trial court's duty to instruct, sua sponte, or on its own initiative, on particular defenses is more limited, arising 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' [Citations.]" (*People v. Barton* (1995) 12 Cal.4th 186, 195.)

"In this context substantial evidence means evidence which is sufficient to deserve consideration by the jury and from which a jury composed of reasonable persons could conclude the particular facts underlying the instruction existed. The trial court is not required to present theories the jury could not reasonably find to exist. [Citations.]" (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 78.) "In deciding whether defendant was entitled to the instructions urged, we take the proffered evidence as true, 'regardless of whether it was of a character to inspire belief. [Citations.]' [Citation.]" (*People v. Petznick* (2003) 114 Cal.App.4th 663, 677.) "[T]he test is not whether *any* evidence is presented, no matter how weak. Instead, the jury must be instructed when there is evidence that 'deserve[s] consideration by the jury, i.e., "evidence from which a jury composed of reasonable [people] could have concluded"' that the specific facts supporting the instruction existed. [Citations.]" (*Ibid.*, italics in original.)

### B. Unconsciousness

"Among those persons deemed incapable of committing a crime are individuals who 'committed the act charged without being conscious thereof.' [Citation.] Unconsciousness, when not voluntarily induced, is a complete defense to a charged crime. [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 887 (Rogers ).)[FN8]

FN8. In contrast, voluntary intoxication is not a complete defense and can never excuse an unlawful homicide. If someone dies as a result of actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter. (People v. Ochoa (1998) 19 Cal.4th 353, 423–424 (Ochoa ).) While there is evidence that defendant drank at least one and part of a second 40–ounce beer before the homicide, defendant has not argued that the killing was the result of unconsciousness because of his voluntary intoxication, or that the court should have instructed the jury with involuntary manslaughter as a lesser included offense. Instead, defendant has limited his argument to the contention that the court should have given CALCRIM No. 3425, unconsciousness as a complete defense.

CALCRIM No. 3425 (formerly CALJIC No. 4.30) states the complete defense of unconsciousness:

> "The defendant is not guilty of *<insert crime[s]>* if (he/she) acted while legally unconscious. Someone is legally unconscious when he or she is not conscious of his or her actions. [Someone may be unconscious even though able to move.]

> "Unconsciousness may be caused by (a blackout[,]/ [or] an epileptic seizure[,]/ [or] involuntary intoxication[,]/ [or] sleepwalking[,]/ or *<insert a similar condition>* ).

> "The People must prove beyond a reasonable doubt that the defendant was

conscious when (he/she) acted. If there is proof beyond a reasonable doubt that the defendant acted as if (he/she) were conscious, you should conclude that (he/she) was conscious. If, however, based on all the evidence, you have a reasonable doubt that (he/she) was conscious, you must find (him/her) not guilty." (Original italics.)

"'Unconsciousness does not mean that the actor lies still and unresponsive. Instead, a person is deemed "unconscious" if he or she committed the act without being conscious thereof.' [Citations.]" (*Rogers, supra*, 39 Cal.4th 826, 887.) "To constitute a defense, unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.' [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417.) "An unconscious act, as defined 'within the contemplation of the Penal Code is one committed by a person who because of somnambulism, a blow on the head, or similar cause is not conscious of acting and whose act therefore cannot be deemed volitional.' [Citations.]" (*People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1083.)

However, a defendant's "own testimony that he could not remember portions of the events, standing alone, [is] insufficient to warrant an unconsciousness instruction. (*People v. Froom* (1980) 108 Cal.App.3d 820, 829–830 ... [evidence the defendant was forgetful and told a psychiatrist he 'awakened' after the crime was committed did not entitle the defendant to an unconsciousness instruction]; *People v. Heffington* (1973) 32 Cal.App.3d 1, 10 ... [there is no 'ineluctable rule' that a defendant's inability to remember supplies an evidentiary foundation for an unconsciousness instruction]; cf. *People v. Coston* (1947) 82 Cal.App.2d 23, 40, [185 P.2d 632] ['a defendant's mere statement of forgetfulness, unsupported by any other evidence, is at most very little evidence of unconsciousness at the time of performing a particular act'].)" (*Rogers, supra*, 39 Cal.4th at p. 888.) While "a reviewing court" must "assume that [the defendant's] selective recollection was natural, not feigned," such testimony is "far short of a claim or description of coexistent unconsciousness, ..." (*People v. Heffington, supra*, 32 Cal.App.3d at p. 10; *People v. Carlson* (2011) 200 Cal.App.4th 695, 704.) Additional evidence to justify an unconsciousness instruction might be based on memory loss or the defendant's mental state. (*People v. Wilson* (1967) 66 Cal.2d 749, 762.)

"A trial court must instruct on unconsciousness on its own motion if it appears the defendant is relying on the defense, or if there is substantial evidence supporting the defense and the defense is not inconsistent with the defendant's theory of the case. [Citation.]" (*Rogers, supra*, 39 Cal.4th at p. 887.)

### *C. Analysis*

Defendant argues the court had a sua sponte duty to give CALCRIM No. 3425, unconsciousness as a complete defense to murder, based on his trial testimony that he was very tired and had a fever that night; that he did not understand what happened when he stabbed Jackie; that his acts were mechanical rather than volitional; and that he had a hazy and incomplete memory of stabbing her. Defendant asserts that defense counsel's closing argument effectively summarized the elements of the unconsciousness defense, but counsel was foreclosed from expressly relying on that defense because the court failed to recognize its sua sponte duty to give CALCRIM No. 3425.

We find the trial court did not have a sua sponte duty to give CALCRIM No. 3425 under the facts and circumstances of this case. Indeed, defendant's

arguments are almost identical to those addressed and rejected by the California Supreme Court in *Rogers, supra*, 39 Cal.4th 826. In that case, the defendant claimed the court had a sua sponte duty to instruct on unconsciousness as a complete defense to two counts of murder. The defendant argued there was substantial evidence to support the instruction based on his own testimony that he had no independent memory of the killings, and an expert's testimony that he "'blacked out'" and could not remember some parts of the incident. (*Id.* at p. 887.)

*Rogers* held the court did not have a sua sponte duty to give the instruction because the experts never testified that the defendant was unconscious, and the defendant only claimed he could not recall the killings. (*Rogers, supra*, 39 Cal.4th at pp. 887–888.)

> "The defense experts' testimony ... does not imply that [the defendant] was unconscious during the events. Rather, it suggests he was aware of the events as they were occurring, but reacted to them emotionally rather than logically. For example, [one expert] testified the killing was an emotional, 'impulsive heat of passion event,' and [another expert] testified the killing was an impulsive, emotional act of passion and fear. *Further, defendant's own testimony that he could not remember portions of the events, standing alone, was insufficient to warrant an unconsciousness instruction.* [Citations.]" (*Id.* at p. 887–888, italics added.)

*Rogers* concluded that the defendant's "professed inability to recall the event, without more, was insufficient to warrant an unconsciousness instruction. [Citations.]" (*Rogers, supra*, 39 Cal.4th at p. 888.)

In this case, defendant did not introduce any expert testimony about his alleged unconsciousness. Thus, his trial testimony would have provided the only evidence pertaining to this purported defense. As in *Rogers*, however, defendant never testified that he was unconscious. Instead, he offered specific details about the events leading up to the very moment that he repeatedly sliced Jackie's neck, and he failed to present any substantial evidence that he was unconscious when he killed her.

Defendant extensively testified about Jackie's alleged demands to drink and party, and defendant's attempts to calm the situation by having her sleep in the bedroom while he stayed in the living room. Defendant explained that he opened up the fold-out bed in the living room and tried to sleep, but Jackie emerged from the bedroom, got into bed with him, and kept yelling at him. Defendant also explained that he got up from the bed and went into the adjacent kitchen to get away from her, but Jackie followed and accused him of not being able to have sex with her. Defendant testified he "started tripping out," and he could not understand "why she was upset." Defendant "couldn't just hear her anymore," but he knew that "I ended up with a knife in my hand."

While defendant did not remember grabbing the knife, he knew he used a knife from the kitchen, that he stood in front of Jackie in the living room, "and then I remember getting my hand and cutting her." Defendant may not have remembered what he was thinking when he repeatedly cut her throat, but he realized that he was cutting her neck for a couple of seconds, and that he could not stop. Defendant also had near-perfect recollection of the what happened after he realized Jackie was dead – he placed her on the bed, slit his own throat, realized after several hours that he was still alive, got up and tried to take care of the baby, repeatedly fell down, returned to the bed, wrote the notes to his family, used another knife to slit his wrist, again realized he was still alive, and decided to

call 911 so someone could take care of the baby. Most importantly, he admitted that he wrote both notes, one of which said that he "'did it for love,'" and the other which said: "'Jackie Lua with me till death. I said it always.'"

Defendant asserts the unconsciousness instruction was supported by other parts of his trial testimony, when he said that "it didn't seem real – what was happening," he was "emotional," he "didn't understand what was going on," he felt like he "blacked out," he realized that she was dead, and then he sliced his own neck. However, defendant's testimony on these points was part of his description of his "very hot-blooded rage," that his "blood was pumping fast and I felt hot." While defendant tried to back away from his initial admission about his "very hot-blooded rage," he repeatedly said that he "felt hot" and his "hand was all hot" during and after the time that he was cutting her neck.

Defendant complains that defense counsel did not realize that he could have relied on unconsciousness as a defense. Given defendant's prior admissions at the scene (through his knowing and responsive gestures to Chief Donnelly and Detective Solis), the presence of the two notes, and the testimony about defendant's prior threats toward Jackie, defense counsel was faced with an extremely difficult task in this case. However, he skillfully relied on the evidence to argue that the homicide was not first degree murder, there was no premeditation or deliberation, and that Jackie's alleged argument with defendant raised the theories of heat of passion and provocation to reduce the killing to voluntary manslaughter.

We thus conclude that the court did not have a sua sponte duty to instruct the jury with unconsciousness as a complete defense. While defendant could not explain why he cut Jackie's neck, defendant testified in fairly "sharp detail" about how he stabbed Jackie. "Defendant's own testimony makes clear that he did not lack awareness of his actions" during the killing, and defendant's claimed memory loss did not create substantial evidence of unconsciousness. (*People v. Halvorsen, supra,* 42 Cal.4th at p. 418.) Moreover, "[defendant's] statement that he did not know what was going through his mind" did not present substantial evidence to trigger the court's sua sponte duty to give the unconsciousness instruction. (See, e.g., *Ochoa, supra,* 19 Cal.4th at p. 424.)

Finally, even assuming that an unconsciousness instruction should have been given, the error is harmless by any applicable standard. (*People v. Boyer* (2006) 38 Cal.4th 412, 470–471.) Aside from defendant's self-serving and inherently inconsistent testimony, there is no evidence of any meaningful value to support the conclusion that defendant was legally unconscious when he repeatedly sliced Jackie's neck. As the pathologist explained, Jackie was not stabbed but instead suffered 8 to 15 cuts across her neck, and it would have taken two to three minutes to inflict those cuts. While defendant claimed he had a "blackout," he only made that claim when the prosecutor pressed him during cross-examination as he tried to retreat from his earlier statement that he was in a "very hot-blooded rage." Moreover, defendant never managed to explain how Jackie suffered the blunt force trauma on her face and body, and the large bruise on the back of her head which could have incapacitated her. Finally, the two notes constituted the most damaging evidence against defendant's claim of unconsciousness, particularly the note that said "'Jackie Lua with me till death. I said it always,'" which corroborated the testimony from Jackie's family and friends about defendant's repeated threats if she left him.

(Resp't's Answer, Ex. A.)

As a preliminary matter, the Court notes that any error in the state court's determination

1    of whether state law allowed for an instruction in this case cannot form the basis for federal

2    habeas relief.  Estelle v. McGuire, 502 U.S. 62, 71 (1991) (citing Marshall v. Lonberger, 459

3    U.S. 422, 438, n. 6 (1983)) ("[T]he Due Process Clause does not permit the federal courts to

4    engage in a finely tuned review of the wisdom of state evidentiary rules").  "'Failure to give [a

5    jury] instruction which might be proper as a matter of state law,' by itself, does not merit federal

6    habeas relief."  Menendez v. Terhune, 422 F.3d 1012, 1029 (quoting Miller v. Stagner, 757 F.2d

7    988, 993 (9th Cir.1985)).  The Supreme Court has stated instead that a claim that a court violated

8    a petitioner's due process rights by omitting an instruction requires a showing that the error "so

9    infected the entire trial that the resulting conviction violate[d] due process."  Henderson v.

10   Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  The

11   burden on Petitioner is especially heavy "where ... the alleged error involves the failure to give

12   an instruction."  Clark v. Brown, 450 F.3d 898, 904 (9th Cir.2006).

13          Even if constitutional instructional error has occurred, the federal court must still

14   determine whether Petitioner suffered actual prejudice, that is, whether the error "had substantial

15   and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507

16   U.S. 619, 637 (1993).  A "substantial and injurious effect" means a "reasonable probability" that

17   the jury would have arrived at a different verdict had the instruction been given.  Clark, 450 F.3d

18   at 916.

19          In this case, Petitioner fails to demonstrate that the trial court's failure was contrary to or

20   an unreasonable application of Supreme Court precedent.  The Sixth Amendment right to a fair

21   trial requires that criminal defendants be afforded a meaningful opportunity to present a

22   complete defense.  California v. Trombetta, 467 U.S. 479, 485 (1984).  In Mathews v. United

23   States, 485 U.S. 58, 63 (1988), the Supreme Court held that "a defendant is entitled to an

24   instruction as to any recognized defense for which there exists evidence sufficient for a

25   reasonable jury to find in his favor."  Federal courts have held that a trial court's failure to give a

26   requested instruction embodying the defense theory of the case and around which the defendant

27   had built his or her defense violates the defendant's due process right to present a complete

28   defense.  See, e.g., Clark v. Brown, 442 F.3d 708, 713–718 (9th Cir.2006) (instruction on felony-

1  murder special circumstance); <u>Bradley v. Duncan</u>, 315 F.3d 1091, 1098-99 (9th Cir.2002)

2  (instruction on defense of entrapment); <u>Conde v. Henry</u>, 198 F.3d 734, 739–740 (9th Cir.2000)

3  (instruction on simple kidnapping as lesser included offense of kidnapping for robbery); <u>United

4  States v. Monger</u>, 185 F.3d 574, 576–577 (6th Cir.1999) (instruction on lesser included offense).

5  In all of these cases, however, the instruction at issue was requested by the defense.  In this case,

6  defense counsel did not request the instruction; rather, Petitioner complains that the trial court

7  failed to *sua sponte* instruct the jury on unconsciousness as a defense.  But the above-noted cases

8  do not support the proposition that a trial court's *sua sponte* failure to instruct denies due process.

9  In fact, the Supreme Court has not clearly established that a trial court is required under the

10  Constitution to issue a defense instruction *sua sponte*.  The Supreme Court has stated that "[i]t is

11  the rare case in which an improper instruction will justify reversal of a criminal conviction when

12  no objection has been made in the trial court." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977).

13  Since there is no clearly established Federal law requiring such a *sua sponte* instruction, this

14  Court cannot conclude that the state court's ruling was an "unreasonable application." <u>Musladin</u>,

15  549 U.S. at 77.

16      Further, as reasonably determined by the appellate court, there was very little, if any,

17  evidence in the record to support the defense of unconsciousness.  Petitioner stated at one point

18  that he had consumed some beer that night, but he had warned the victim they shouldn't drink

19  because of the baby. (RT 917, 919, 925.)  He recalled they each purchased a 40-ounce beer,

20  which was customary for the two of them, but he did not recall if he finished his beer because he

21  was feeling sick with a fever that day and did not want to drink.  (RT 917, 919-920, 924.)

22  Petitioner testified that he was in a hot-blooded rage when he attacked the victim.  (RT 956.)  On

23  cross-examination, the prosecutor pursued the topic of Petitioner's "hot-blooded rage." (RT 957.)

24  Petitioner then attempted to retreat from his admission of being in such a rage as follows:

25    A. I remember she was telling me a lot of things and I couldn't hear them
26    anymore. It started fading away. So many things were coming together in my head, and then I don't know what happened. It felt like – like I blacked out because I remember my - -

27

28    Q. You remember all the things that she said to you, right?

A. Some of them.

(RT 957-958.)

Although Petitioner claimed that he consumed beer, was suffering from a fever, and was in a hot-blooded rage such that he allegedly unable to handle his emotions, he never claimed that he was unconscious during the attack.

On the other hand, overwhelming evidence showed Petitioner was completely conscious and fully aware of his actions when he committed the crime.  He recalled the entire night in great detail.  He recalled arguing with the victim when they returned from purchasing the beer. (RT 922.)  He stated they continued to argue until Petitioner stated he wanted to go to sleep. (RT 923.)  He refused to buy the victim more beer and offered to sleep in another room. (RT 925.)  He recalled that after several minutes of resting on his pull-out couch, the victim began arguing with him again. (RT 926-927.)  The victim then came into the room where he was lying down and got into bed with him and continued to yell at him. (RT 927.)  He recalled that she insulted him repeatedly. (RT 927-928.)  He then got up and went near the kitchen while she continued to yell. (RT 927.)  Petitioner states that as she continued to hurl insults at him, he "couldn't just hear her anymore," "[e]verything just came together in [his] head," he "didn't know what happened," but he "ended up with a knife in [his] hand." (RT 929.)  He then remembered that he began cutting her. (RT 929.)  He recalled that his hand was hot and her body became numb. (RT 929.)  He stated that when he had "seen that [he] was cutting her, [he] realized when [he] saw her face that it was just like a blank stare." (RT 929.)  He "laid her down" and it looked "like she was gone" whereupon Petitioner cut himself as well. (RT 929.)  He stated he cut himself because she was gone and he didn't want to stay behind. (RT 930.)  He then hugged her and told her that he loved her. (RT 930.)  He kissed her and lay down next to her. (RT 930.)  Thereafter, he got up several times and went to the kitchen, the bathroom and the bedroom. (RT 931.)  He recalled getting the baby some milk. (RT 933.)  He then proceeded to write several notes to his family. (RT 935-936.)  In one note, he wrote: "Jackie Lua with me till death. I said it always." (RT 202.)  In another note, he wrote: "I did it for love. Forgive me, God. Mom, I love you with all my

1    heart." (RT 203.)  Then, because he hadn't succumbed to his initial self-inflicted wound, he cut

2    himself on the wrist in a final attempt to end his life. (RT 937.)  When the second wound proved

3    unsuccessful, he called the police because it had been a long time and he wanted someone to pick

4    up the baby. (RT 938.)

5            In light of the evidence, it is clear an instruction on unconsciousness was not warranted.

6    There was simply no evidence from which a rational trier of fact could have concluded that

7    Petitioner committed the crime while unconscious.  Indeed, Petitioner's own testimony along

8    with his notes plainly showed he was conscious, aware of his actions, and acted volitionally.

9            Moreover, as pointed out by Respondent, any error was clearly harmless.  In an effort to

10   avoid a conviction for first or second degree murder, defense counsel strenuously argued that

11   Petitioner attacked the victim out of sudden quarrel or heat of passion so as to garner a

12   conviction for the lesser offense of voluntary manslaughter.  The jury rejected the theory by

13   finding Petitioner guilty of second degree murder.  Thus, the jury clearly determined that

14   Petitioner was conscious when he committed the murder.  For this reason, Petitioner cannot show

15   the failure to instruct the jury on unconsciousness "had a substantial and injurious effect or

16   influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.  Also, because Petitioner

17   was allowed to present the defense he chose, followed by jury instructions he agreed to, he was

18   not denied due process by being deprived of the opportunity to present a complete defense.

19   Mathews, 485 U.S. at 63.  Accordingly, the state court rejection of Petitioner's claim was not

20   contrary to or an unreasonable application of clearly established Supreme Court precedent. 28

21   U.S.C. § 2254(d)(1).  The petition must be denied.

22                                                    **IV.**

23                                    **CERTIFICATE OF APPEALABILITY**

24           A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

25   district court's denial of his petition, and an appeal is only allowed in certain circumstances.

26   Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining

27   whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

28           (a) In a habeas corpus proceeding or a proceeding under section 2255 before a

district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000).   While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.   Petitioner has not made the required substantial showing of the denial of a constitutional right.   Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

**V.**

**ORDER**

Accordingly,

IT IS HEREBY ORDERED:

1) The petition for writ of habeas corpus is DENIED WITH PREJUDICE;

2) The Clerk of Court is DIRECTED to enter judgment and terminate the case; and

3) The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   **January 27, 2014**

UNITED STATES MAGISTRATE JUDGE